# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARQUETTE TRANSPORTATION** § | | |
| **COMPANY GULF-INLAND, LLC** § | Civil Action No.: 2:19-10927 | |
| § | | |
| **VERSUS** § | | |
| § | | |
| **NAVIGATION MARITIME BULGAREA;** § | JUDGE NANNETTE JOLIVETTE | |
| **and BALKAN NAVIGATION LTD** § | BROWN | |
| § | | |
| § | MAGISTRATE JUDGE DONNA | |
| § | PHILLIPS CURRAULT | |
| § | | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF THIRD-PARTY DEFENDANT CAPTAIN ROBERT JOHNSON

Third-Party Defendant, Captain Robert "Bobby" Johnson ("Capt. Johnson"), respectfully submits this Memorandum in Support of his Motion for Partial Summary Judgment seeking dismissal of Marquette Transportation Company Gulf-Inland, LLC's ("Marquette") Third-Party Complaint which alleges Captain Johnson was grossly negligent while acting as the compulsory state pilot aboard the M/V STRANDJA on January 3, 2019.[3] Marquette's own factual allegations against Captain Johnson, if accepted as true, do not constitute clear and convincing evidence of gross negligence by Captain Johnson. While some of Marquette's allegation could arguably support a finding of ordinary negligence against Captain Johnson, state compulsory pilots such as Captain Johnson cannot be held personally liable absent a finding of gross negligence.[4]

### I.  FACTUAL BACKGROUND

As evidenced by the Joint Pre-Trial Order filed on August 19, 2021, the parties agree on

---

[3] Rec. Doc. No. 15.
[4] LA R.S. 34:1137

1

many of the general facts of this case.[5] While Captain Johnson admits there remain a number of contested facts related to actions taken or omitted by each of the parties, none of those factual disputes are material for purposes of the instant motion because, even under the version of events asserted by Marquette, Pilot Johnson is not liable. Thus, for purposes of the present Motion for Partial Summary Judgment only, Captain Johnson adopts the factual background set forth by Marquette in its recently filed Memorandum in Opposition to Capt. Johnson's Motion in *Limine* to Exclude Cumulative Expert Testimony.[6] For ease of reference, the factual background contained in pages 2-6 of Marquette's Memorandum in Opposition to Capt. Johnson's Motion in *Limine* to Exclude Cumulative Expert Testimony is reproduced below:

*This case arises out of a collision which occurred on January 3, 2019, in the Mississippi River between Marquette's towing vessel, the M/V KIEFFER E. BAILEY, and the M/V STRANDJA, an ocean-going vessel owned by Defendant Balkan Navigation Ltd. And operated by Navigation Maritime Bulgare JSC (collectively, "Balkan"). The STRANDJA is a large bulk carrier of Panamanian flag, with a gross tonnage of 19,865, length of 610 feet, breadth of 78 feet, and 9,789 horsepower. The KIEFFER E. BAILEY is a z-drive propelled inland towboat, 195 gross tons, with a length of 76 feet, breadth of 34 feet, and 2,000 horsepower. The KIEFFER E. BAILEY was pushing six loaded barges strung out three long and two barge lengths wide at the time of collision. The total dimensions of the KIEFFER E. BAILEY's tow was approximately 600 by 105 feet, plus the vessel of 76 feet. The different vessels are pictured below.* (images included in the original memorandum have been omitted).

*At the time of the collision, the KIEFFER E. BAILEY and her six barge tow was transiting*

---

[5] *See e.g.,* Rec. Doc. No. 105 at pg. 5-7 (Proposed Pre-Trial Order by Balkan Navigation Ltd., Crescent Towing & Salvage Co., Inc., Robert Johnson, Marquette Transportation Company Gulf-Inland, LLC, Navigation Maritime Bulgare JSC).
[6] Rec. Doc. No. 101 pg. 2-6.

*down the middle of the Mississippi River, having just passed Algiers Point and nearing Chalmette, Louisiana. As the KIEFFER BAILEY was proceeding down the middle of the river near Mile Marker 90, the STRANDJA, with the harbor tug PROVIDENCE alongside her bow, inexplicably and completely unannounced began topping around out of her designated anchorage (General Anchorage) on the right descending bank (West Bank). The STRANDJA entered directly into the established navigational path of the southbound KIEFFER E. BAILEY and her tow, contrary to good seamanship and in direct violation of the Inland Rules of the Road. Immediately, the KIEFFER E. BAILEY radioed the STRANDJA to inform her of her unsafe navigation. But neither the pilot on board (Johnson) nor the master or other navigation officer on watch of the STRANDJA responded, reflecting the vessel's lack of attentiveness to its obligations and improper bridge team communication.*

*The KIEFFER E. BAILEY then attempted to attract the STRANDJA's attention by whistle/radio and steer away from the STRANDJA. However, the STRANDJA kept moving broadside in the Mississippi River directly into the path of the down bound KIEFFER E. BAILEY, ultimately striking her tow and causing a collision. The objective AIS data establishes that the STRANDJA is solely at fault for the collision due to her sudden and unannounced reckless jumping maneuver out of the designated General Anchorage (dark shaded area) into the center of the river and KEIFFER E. BAILEY's path. As depicted in the Mississippi River Traffic Information System ("MRTIS") screen shot below, the STRANDJA was moving rapidly to starboard into the KIEFFER BAILEY when the collision occurred.* (MRTIS screen shot omitted).

*Notwithstanding, Balkan denied liability for the collision and Marquette's resulting damages. Marquette filed suit in this Court shortly thereafter. The issue of liability is complicated by the different vessels involved and the location of the collision. For example, to operate a tow*

*like that of the KIEFFER E. BAILEY in the Mississippi River, the towing vessel must be operated by a licensed mate or master of towing with sufficient experience to maneuver the tow. When the STRANDJA calls to the Mississippi River, she is required to take on a compulsory river pilot and must have a license ship officer in the bridge, in addition to the ship's crew. During the incident, Johnson was the compulsory pilot aboard the STRANDJA. The STRANDJA's Master, Kiril Karapanov, and Third Officer, Viktor Kokoshyan, were on the bridge, and her Chief Officer, Ivan Vasilev, was on the forecastle. The conduct of all of these players is relevant to the liability determination. As such the collision involves three distinct areas of maritime navigation; ocean-going vessel navigation; inland towboat navigation; and Mississippi River ship pilotage.* [7]

## II. LAW AND ARGUMENT

### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the non-movant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir.1998). The non-movant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence

---

[7] *Id*.

to establish a genuine issue. *Id*. Conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.,* 7 F.3d 1203, 1207 (5th Cir.1993).

Here, Captain Johnson's Motion for Partial Summary Judgment is limited to a single issue, whether there is clear and convincing evidence supporting Marquette's allegations of gross negligence against Captain Johnson. Captain Johnson admits there are a number of material contested facts in this case. Nonetheless, partial summary judgment dismissing Marquette's Third-Party Complaint against Captain Johnson is appropriate because Marquette's own factual allegations and expert testimony against Captain Johnson, if accepted as true, are insufficient to establish gross negligence under LA. R.S. 34:1137.

Of course, the fact that Captain Johnson was not grossly negligent does not exclude a finding of ordinary negligence for which the STRANDJA may be liable *in rem*. The two theories are separate and distinct and the issue of potential ordinary negligence by Captain Johnson is not part of the present motion.

### B. The Gross Negligence and Clear and Convincing Evidence Standards Apply to Louisiana River Pilots

Under LA R.S. 34:1137, a Louisiana state commissioned river pilot can only be held personally liable if there is clear and convincing evidence that the damages claimed were caused by the pilot's gross negligence or willful misconduct:

> Any party seeking to hold a pilot acting under his state commission issued in accordance with this Chapter liable for damages or loss occasioned by the pilot's errors, omissions, fault, or neglect shall be required to prove by clear and convincing evidence that the damages arose from the pilot's gross negligence or willful misconduct.[8]

---

[8] LA R.S. 34:1137

This Court has enforced LA R.S. 34:1137's evidentiary requirements on numerous occasions. For example, in *Belala v. Coastal Towing Co*., No. Civ. A. 01-3137, 2002 U.S. Dist. LEXIS 23393, 2002 WL 31729491 (E.D. La. Dec. 3, 2002), Judge Fallon granted a compulsory pilot's motion for summary judgment on the basis that the plaintiff in that case had not alleged *and would not be able to prove* gross negligence under the facts presented to the court:

> However, even if the Plaintiff had alleged gross negligence, the result would not change. The facts of this case simply do not meet the strict standard of gross negligence, which has been described as "willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence." *Id*. at *2.

In determining that the *Belala* plaintiff had failed to provide clear and convincing evidence of gross negligence, Judge Fallon cited the Fifth Circuit's decision in *Houston Exploration Co. v. Halliburton Energy Serv., Inc*., 269 F.3d 528, 531 (5th Cir.2001), which illustrates that gross negligence consists of substantially more egregious behavior than is sufficient for a finding of ordinary negligence:

> Under Louisiana law, gross negligence is willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence. We stated in *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.,* that "[g]ross negligence is substantially and appreciable higher in magnitude than ordinary negligence." Other courts have defined gross negligence as the "entire absence of care," the "want of even slight care and diligence," and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." At least one Louisiana court stated that one is grossly negligent when he **"has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."** Mere inadvertence or honest mistake does not amount to gross negligence. *Id.* at 532. (emphasis added and internal citations omitted).

Moreover, LA R.S. 34:1137 requires that evidence of a pilot's gross negligence be clear and convincing. The Fifth Circuit defines clear and convincing evidence as "that weight of proof

which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, **evidence so clear, direct, weighty and convincing as to enable [the] fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case."** *Moawad v. Childs,* 253 F.3d 700, 2001 WL 498491, at *1 (5th Cir. Apr.9, 2001) (quoting *Travelhost, Inc. v. Blandford,* 68 F.3d 958, 961 (5th Cir.1995)) (emphasis added); *accord Hornbeck Offshore Servs., L.L.C. v. Salazar,* 701 F.3d 810, 815 (5th Cir.2012); *Am. Serv. Mktg. Corp. v. Bushnell,* No. 09–3097, 2009 WL 1870887, at *2 (E.D.La. June 25, 2009).

Importantly, the specific duty of a pilot such as Capt. Johnson is to exercise that degree of care and skill possessed by the average pilot. A compulsory pilot's decisions are not negligent (and therefore far from grossly negligence) if they are the decisions a competent compulsory pilot might reasonably have made under the same circumstances. *River Pars. Co. v. M/V FLAG ADRIENNE,* No. Civ. A. 01-0007, 2002 WL 1453826, at * 5 (E.D. La. July 2, 2002). As summarized by the Fifth Circuit in *Am. Zinc. Co. v. Foster*, 313 F. Supp. 671, 682 (S.D. Miss 1970), modified, 441 F.2d 1100 (5th Cir. 1971):

> The duty of the pilot is to exercise that degree of care and skill possessed by the average pilot, and the mere fact that a different course of action might have avoided a collision is not enough in itself to condemn him to legal liability. The pilot's decision to handle the movement as he did was that of a reasonably competent harbor pilot under the circumstances that existed. He exercised the due care and skill required of him and was not required to be infallible.

Accordingly, the fact that the January 3, 2019 accident occurred is not evidence of negligence by Captain Johnson. Whether in hindsight it appears Captain Johnson could have avoided the collision by taking a different course of action, and whether a different pilot might have avoided

the incident by taking different actions, are not in and of themselves evidence of negligence (in any degree) by Captain Johnson.

Recently, in *Archer Daniels Midland Co. v. M/T AMERICAN LIBERTY*, 2021 WL 2621804 (E.D. La. June 25, 2021), Judge Fallon dismissed gross negligence claims asserted against Captain Brandon Woodford, a federal pilot aboard the AMERICAN LIBERTY at the time that vessel allided with a crane barge and two other vessels on the Mississippi River, one of which then contacted and damaged the ADM Reserve grain facility.[9] In anticipation of numerous damage claims, the owners of the AMERICAN LIBERTY filed a limitation action under 46 U.S.C.§30505 and as expected, a number of parties filed claims against the AMERICAN LIBERTY in the limitation action. Notably, the owners of the AMERICAN LIBERTY filed a third-party complaint and Rule 14(c) tender against Pilot Woodford arguing the damages claimed against the vessel were caused by his gross negligence as the federal pilot aboard.[10] Following trial on the merits, Judge Fallon dismissed the vessel owner's third-party complaint against Pilot Woodford, holding that while there was evidence that Pilot Woodford's actions may have contributed to the various collision/allisions, there was simply no evidence his actions were grossly negligent:

> There is evidence to support the conclusion that the Pilot released the stern tug, the M/V VERA BISSO, too soon and that this was a precipitating event which eventually caused the allisions. Nevertheless, under the law and Crowley policy, a pilot is only an advisor and his presence does not free the master of his ultimate responsibility for the safe navigation of the vessel.[11]

As discussed in more detail in the section below, Captain Johnson is not requesting the Court determine at this time that his actions did not contribute in any way to the collision with the

---

[9] *Archer Daniels Midland Co. v. M/T AMERICAN LIBERTY*, Case 2:19-cv-10525-EEF-JVM (E.D. La. June 25, 2021) Rec. Doc. No. 503, Findings of Fact and Conclusions of Law signed by Judge Eldon E. Fallon at pg. 19 ¶10 attached hereto as Exhibit A.
[10] *Id*. at pg. 4 ¶ 10 – pg. 6 ¶ 16.
[11] *Id* at pg. 30 ¶ 1 -pg. 31¶ 3.

8

KIEFFER BAILEY. Rather, the present motion for partial summary judgment seeks the limited determination that Marquette cannot show by clear and convincing evidence that Captain Johnson was grossly negligent on January 3, 2019. In the absence of clear and convincing evidence of gross negligence, Marquette's Third-Party Complaint against Captain Johnson should be dismissed under LA R.S. 34:1137.

### C. Marquette's Claims and Allegations against Capt. Johnson Do Not Rise to the Level of Gross Negligence

#### *1. Marquette's Third-Party Complaint*

On August 29, 2019, Marquette filed a Third-Party Complaint against Captain Johnson asserting a cause of action under Federal Rule of Civil Procedure 14(c).[12] Marquette's Third-Party Complaint contains a number of specific allegations of purported gross negligence against Captain Johnson. Captain Johnson disputes the accuracy and characterization of Marquette's allegations against him. Nonetheless, even taken at face value, the allegations below do not constitute clear and convincing evidence of gross negligence. For example, Marquette alleges that:

> Pilot Johnson's unannounced attempt to intentionally top out of M/V STRANDJA's designated anchorage as "quick as possible" into the path of oncoming traffic while talking on his cellphone in callous disregard for the safety of oncoming traffic constitutes gross negligence and willful misconduct making him liable for the collision.[13]

Marquette contends that Captain Johnson acted in a rushed manner on the day of the accident. However, Marquette does not provide evidence that Captain Johnson's alleged "hurried" state caused the collision with the KIEFFER BAILEY. The mere fact that one is trying to complete a task quickly does not equate to an intentional act of "unreasonable character in reckless disregard

---

[12] Rec. Doc. No. 15 at pg. 4.
[13] Rec Doc. No. 15 at pg. 9 ¶ 24.

of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."[14]

Marquette further alleges:

> Pilot Johnson's intentional and callous failure to conduct a master pilot exchange and intentional decision to top around into the path of oncoming traffic before discussing the maneuver with M/V STRANDJA's crew and oncoming traffic constitutes gross negligence and willful misconduct making him liable for the collision.[15]

Likewise, there is no evidence that Captain Johnson's **alleged** failure to conduct a master- pilot exchange lead to the collision with the KIEFFER BAILEY. In any case, Captain Johnson's deposition testimony suggests he was planning to have a master pilot exchange with the STRANDJA's master before departing General Anchorage.[16]

Marquette's Third-Part Complaint continues:

> Pilot Johnson's intentional and callous failure to announce that he would be intentionally topping out of the designated anchorage and into the path of KIEFFER E BAILEY constitutes gross negligence and willful misconduct which makes him liable for the incident.[17]

Captain Johnson explained numerous times during his deposition that at the time of the accident the STRANDJA was still actively engaged in anchor heaving operations and therefore, was not yet underway. Captain Johnson testified that until the STRANDJA had completed anchor lifting operations and was ready to leave the anchorage under power it did not make sense to announce normal anchoring movements to approaching river traffic.[18] No passing agreement could be reached under the circumstances and most vessels, including the KIEFFER BAILEY were

---

[14] *Cates v. Beauregard Elec. Co-op., Inc.*, 316 So.2d 907, 916 (La.Ct.App.1975), aff'd, 328 So.2d 367 (La.1976); *see also Orthopedic & Sports Injury Clinic*, 922 F.2d at 224 n. 3.
[15] Rec. Doc. No. 15 at pg. 9 ¶ 25.
[16] *See* excerpts of deposition transcript of Captain Johnson at pg. 170:20-176:22 attached hereto as Exhibit B.
[17] Rec. Doc. No. 15. at pg. 9 ¶ 26.
[18] *See* deposition transcript of Captain Johnson at pg. 53:8-24 attached hereto as Exhibit B

equipped with navigation equipment which would have showed that the STRANDJA was engaged in anchor heaving operations and therefore should be afforded a wide berth. There is no evidence, much less clear and convincing evidence, to refute Pilot Johnson on these issues,

> Captain Johnson:
>
> A. I don't call every tow that comes down the river when I'm stationary at—at the anchorage. You know, he's got an AIS, a radar, and a whole bunch of other equipment, I'm sure, that can tell him whether I'm underway or not underway and under propulsion. So he—He had to have saw that it is in anchorage with ships lined up in anchorage with a tug alongside way before he came down. So that's kind of his job, is to figure out whether I'm maneuvering, not maneuvering.
>
> Q. And isn't it part of your job to know whether or not there's any downbound traffic that you might come into contact with?
>
> A. When I'm—when I'm underway, I do.[19]

Further, from Marquette's Third-Party Complaint:

> Pilot Johnson's intentional and callous disregard of the U.S. Coast Guard Safety Alerts admonishing him not to use his cellphone during navigation constitutes gross negligence and willful misconduct which makes him liable for the incident.[20]

The Coast Guard Safety Alert referred to by Marquette in the above allegation was neither a personal admonishment to Captain Johnson as Marquette seems to insinuate, nor is it a mandatory regulation prohibiting the use of cell phones on the bridge.[21] Rather USCG Advisory 01-10 merely advises against the use of cell phones "when mariners are <u>navigating or working alone.</u>"[22] Importantly, during the approximately three-minute period Captain Johnson was on his cell phone, the STRANDJA was still heaving anchors and not navigating.[23] Accordingly, Captain Johnson's

---

[19] *Id*.
[20] Rec Doc. No. 15. at pg. 9 ¶ 27
[21] *See* copy of United States Coast Guard Marine Safety Advisory 01-10 attached hereto as Exhibit C.
[22] *Id*.
[23] *See* deposition transcript of Captain Johnson at pg. 23:1- 25:16 attached hereto as Exhibit B.

use of his cellphone did not violate any federal, state or Coast Guard regulation.

> For its penultimate allegation, Marquette's Third-Party Complaint asserts:
> Pilot Johnson's intentional and callous disregard/refusal to respond to KIEFFER E. BAILEY's radio calls and whistle signals constitutes gross negligence and willful misconduct which makes him liable for the incident.[24]

Captain Johnson testified that he did not hear the KIEFFER E. BAILEY's radio calls and whistle signals because the KIEFFER BAILEY failed to call the STRANDJA by its name and/or Captain Johnson by his pilot number.[25] Likewise, neither the STRANDJA's Master nor her crew heard any radio communication from the KIEFFER BAILEY that they understood as addressing the STRANDJA.[26] Therefore, it was entirely unclear who the KIEFFER BAILEY was trying to communicate with.

Moreover, the captain of the KIEFFER BAILEY testified he did not know the proper whistle to use in this situation.[27] Accordingly, he did not use the universally recognized danger signal of five short blasts, which would have alerted Captain Johnson and the STRANDJA's Master and crew of the impending collision; instead, the KIEFFER BAILEY's captain was using whistles customarily used to signal a passing agreement, and then a 60-second blast which has no meaning at all under the Inland Navigation Rules governing sound signals.

> Q. Captain, did you hear whistle signals from the KIEFFER BAILEY?
>
> A. Yes, I hear that. Yes.
>
> Q. Did you understand those whistle signals to be calls to your vessel to get the STRANDJA's attention?
>
> A. Yes. I heard the –Yes. I heard two short signals. I already comment – made my comments on that, which means that

---

[24] Rec. Doc. No. 15 at pg. 9 ¶ 28
[25] *See* deposition transcript of Captain Johnson at pg. 218:14- 220:16 attached hereto as Exhibit B.
[26] *See* deposition transcript of Captain Kiril Karapanov at Vol. II pg. 292:12-295:3 attached hereto as Exhibit D.
[27] *See* deposition transcript of Jerrell Nobles at pg. 167:19-172:13 attached hereto as Exhibit E.

> the—the one who is making these short signals, he intends to change his course left.
>
> Q. Did he make any other signals after that?
>
> A. So as I remember, after these two short signals, at the very, very last minute there was one constant signal that doesn't mean anything.
>
> Q. That didn't mean anything to you; is that your testimony?
>
> A. So after the—After—After the two short signals, at the very last moment we heard some constant signal, but it is not a signal. It's a sound, like a sound signal.
>
> Q. Did you understand those sounds to be calls to your vessel, the STRANDJA, to get your attention?
>
> A. I understood the question. I want to formulate my answer. According to the rules, to cause someone's attention, they say exact signal to do that.
>
> Q. Not my question Captain.
>
> A. So to get someone's attention, the specific signal, that is five short signals to call someone's attention. So the same was as the two short signals means that it is—it is going to change its course left so it will not interfere with us. The same way, if it wanted to cause our atte—someone's attention, it needs to give five short signals.[28]

There is no clear and convincing evidence that Captain Johnson intentionally and callously disregarded the KIEFFER E. BAILEY's attempts to communicate. Rather, the evidence suggests the KIEFFER E. BAILEY's captain was never trained by Marquette how to properly communicate with river traffic.

Finally, Marquette's Third-Party Complaint alleges as follows:

---

[28] *See* deposition transcript of Captain Kiril Karapanov at Vol. III pg. 409:18-411:7 attached hereto as Exhibit D.

13

> Pilot Johnson's intentional and callous disregard of the M/V STRANDJA's crew's efforts to persuade Pilot Johnson to focus on M/V STRANDJA's navigation as M/V STRANDJA was topping out into the navigable channel and into the path of the downbound KIEFFER E. BAILEY constitutes gross negligence and willful misconduct which makes him liable for the incident.[29]

The STRANDJA's crew's "efforts to persuade" Captain Johnson to focus the STRANDJA's navigation referred to by Marquette is a single exchange between the STRANDJA's master and Captain Johnson wherein the master pointed out the position of the KIEFFER BAILEY to Captain Johnson and Captain Johnson confirmed he was aware of the KIEFFER BAILEY's location and did not feel there was a risk of collision at that point.[30] This brief exchange between the master and the pilot is simply not "an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."

Indeed, Captain Johnson repeatedly testified that he was aware of the KIEFFER BAILEY's position prior to the collision but that he expected the KIEFFER BAILEY to move away from the STRANDJA, as is customary for more maneuverable tugs such as the KIEFFER BAILEY to do when approaching General Anchorage.

> Q. On that day before the collision occurred, did you ever sound your danger signal?
>
> A. No. I didn't think I was in danger.
>
> Q. Is that why, because you didn't think you were in danger?
>
> A. Yeah. I -- I -- Like I said, I didn't think he was gonna hit the ship until he hit the ship, so ...
>
> Q. How many feet did you expect that the KIEFER BAILEY would pass you by?

---

[29] Rec Doc. No. 15 at pg. 9 ¶ 28
[30] *See* deposition transcript of Captain Johnson at pg. 254:3- 255:3 attached hereto as Exhibit B.

A. S -- Wait. Say that again. How much did I think he was –

Q. That you can -- You -- You said you thought the KIEFER BAILEY would steer away from you; correct?

A. Right. (Witness nods head affirmatively.)

Q. And how many feet did you think he would pass you by? What -- At what distance?

A. I -- Like I said, I can't control another vessel's captain. I don't -- I have no clue. I -- I -- I can -- you know. That's -- That's -- That's on him.

Q. What -- Do you think the KIEFER was entitled to rely upon the fact that you were at anchorage, that you would not leave the anchorage?

A. I wasn't leaving the an -- anchorage. I was starting to heave an anchor, but I was not ready to leave the anchorage. Again, that could've taken another 40 minutes.

Q. Do you think KIEFER BAILEY was expected to anticipate that day that you would leave the anchorage area as defined by the Code of Federal Regulations?

A. I expected the KIEFER BAILEY to use his AIS, his radar to see that there's a sh -- there's a -- anchors, ships at anchorage, and do whatever he d – needs to do as a -- as a mariner to stay as far away from that anchorage as possible as to not have a collision. And it's the same with my responsibility when I'm meeting, overtaking another vessel.[31]

Pilot Johnson's testimony that he assessed the KIEFFER BAILEY's approach and determined there was no risk of collision, which is unrefuted, precludes a finding that he recklessly disregarded the risk.

    **2.** ***Marquette's Expert Witness Captain Wayne Wilson did not Include Clear and Convincing Evidence of Gross Negligence In His Expert Report***

---

[31] *See* deposition transcript of Captain Johnson at pg. 113:10- 115:5 attached hereto as Exhibit B.

In its Memorandum in Opposition to Captain Johnson's Motion in *Limine* to Exclude Cumulative Expert Testimony, Marquette asserted that of its three expert witnesses, only Captain Wayne Wilson is being offered to opine regarding Captain Johnson's conduct at the time of the collision: "Captain Wilson discusses the reasonableness of Pilot Johnson's conduct at the time of the collision, specifically under the rules, regulations and customs applicable to Mississippi River pilots. Captain Fernandes and Captain Berry do not"[32] Based on this assurance by Marquette, only Captain Wilson's report is addressed herein.

Captain Wilson offers the following opinions regarding Captain Johnson's actions aboard the STRANDJA:

> Opinion No. 3
> It was inappropriate and unsafe for Captain Johnson to be on his cellphone under the circumstances. Capt. Johnson was in a maneuvering situation that dangerously impacted vessel traffic and he should not have allowed himself to be distracted by his cell phone. Under no circumstances should Captain Johnson have been using his cellphone in this situation. Captain Johnson's actions and inactions during the incident confirm he was distracted by his cellphone use. Capt. Johnson intentionally maneuvered the STRANDJA into the navigable channel even though KIEFFER BAILEY was approaching and failed to respond to KIEFFER BAILEY's radio call and whistle before the incident. [33]

The above allegations by Captain Wilson are identical to those asserted in Marquette's Third-Party Complaint and are fully addressed above. Importantly, Captain Wilson does not provide any specific information or evidence supporting the allegation that Captain Johnson's use of his cell phone while the STRANDJA was heaving anchors caused the accident at issue, or that Captain Johnson knew that using his cell phone would a create a dangerous situation but chose to do so in spite of this knowledge. Captain Wilson also does not identify a single federal regulation,

---

[32] Rec. Doc. No. 101 at pg. 12.
[33] *See* expert report of Captain Wayne Wilson at pg. 3 attached hereto as Exhibit F.

applicable rule of conduct, or other authority to support his opinion. Further, Captain Johnson's deposition testimony, again unrefuted, is that he did not feel distracted by his call, was generally aware of the KIEFFER BAILEY's location, and did not expect the KIEFFER BAILEY would continue to approach so close to the STRANDJA when there was a significant amount of space available in the channel for the KIEFFER BAILEY to move away from the STRANDJA.[34]

Captain Wilson's then offers the following opinions on Pilot Johnson's conduct:

> Opinion 4
> There is nothing customary, usual or expected of a ship making an unannounced movement out of an anchorage. Capt. Johnson testified the STRANDJA's movement out of General Anchorage was normal and should have been anticipated by vessel traffic. Capt. Johnson is incorrect. Downbound traffic such as the KIEFFER BAILEY cannot anticipate that a ship like STRANDJA will suddenly swing out into the path of traffic. It is critical for ships like STRANDJA to advise vessel traffic and concerned traffic in area like KIEFFER BAILEY before leaving a designated anchorage like General Anchorage. This is particularly true for the area surrounding the General Anchorage due to transiting traffic density and fleet boats working barge fleets.
>
> Opinion 6
> Before heaving anchors, a pilot on the Mississippi River must have an adequate master pilot exchange. The pilot must call New Orleans Vessel Traffic to give his/her position and intention to depart an anchorage. The pilot must make a security call on VF Channel 67. The pilot must establish radio communication with vessels transiting in the vicinity. An example of this is Crescent 23's communication with VTS and vessel traffic. Captain Johnson failed to do any of these critical tasks.
>
> Opinion 7
> Before departing an anchorage, a pilot on the Mississippi River must call New Orleans VTS to give his/her position and intentions. The pilot must make a security call on VHF Channel 67. The pilot must establish radio communication with vessels transiting in the vicinity. Captain Johnson failed to do any of these critical tasks.
>
> Opinion 11

---

[34] *See* deposition transcript of Captain Johnson at pg. 113:10- 115:5 attached hereto as Exhibit B.

17

> Captain Johnson testified that he was not maneuvering at the time of the incident. Captain Johnson is incorrect. You are maneuvering on the Mississippi River anytime you are controlling the movement of a vessel by way of pulling on anchors, use of a tugboat, use of rudders and/or use of engines. Captain Johnson should have warned KIEFFER BAILEY before intentionally maneuvering the STRANDJA out into the middle of the river. Had Captain Johnson given any consideration for the safety of vessel traffic, he would have scanned the river and delayed his movement out into the middle of the river until after KIEFFER BAILEY cleared STRANDJA. Captain Johnson failed to do so.
>
> Opinion 13
> STRANDJA's intentional and unannounced movement out of the General Anchorage into the middle of the Mississippi River showed a complete disregard for the safety of the KIEFFER BAILEY (and those aboard her), violated Mississippi river piloting practices, and the following Rules: Rule 2 (ordinary practice of seaman); Rule 5 (look-out); Rule 6 (safe speed); Rule 7 (risk of collision); Rule 8 (action to avoid collision); Rule 9 (narrow channel); the vessel bridge to bridge radiotelephone act. [35]

Even accepting Captain Wilson's unsupported conclusion that "there is nothing customary, usual or expected" for a ship heaving anchors to yaw and/or sway as the anchors are lifted, the evidence indicates that Captain Johnson sincerely believed, based on his 26 years working as a pilot in the Mississippi River, that it was not unusual for a vessel's bow or stern to temporarily swing out of the anchorage onto the navigation channel.[36] Indeed, Captain Johnson testified he believed any experienced mariner would anticipate such movement was possible and afford vessels engaged in anchor maneuvers a much space as possible.[37]

Neither Captain Wilson nor Marquette provide any evidence that Captain Johnson knew that the STRANDA's movement immediately before the collision was unexpected enough that it warranted reaching out to Vessel Traffic Control ("VTC") and all nearby vessels but "callously"

---

[35] *See* expert report of Captain Wayne Wilson at pg. 3-5 attached hereto as Exhibit F.
[36] *See* deposition transcript of Captain Johnson at pg.59:20- 61:23 attached hereto as Exhibit B.
[37] *Id*.

chose not. Rather, Captain Johnson testified that in his long experience as a river pilot, VTC preferred pilots only call once anchor heaving operations were completed and the vessel ready to sail down river.[38] Importantly, even accepting as true that Captain Johnson was mistaken in his belief that the STRANDJA's movement was normal and that VTC should not be contacted until the STRANDJA was ready to proceed downriver, only suggest that Captain Johnson made a mistake – not that his actions were grossly negligent.

>Finally, Captain Wilson opines as follows:

>Opinion 8
>The bridge audio and testimony indicate that Capt. Johnson was in a rush. Capt. Johnson asked the crew to start heaving anchors from the pilot boat. When entering the bridge, Capt. Johnson immediately asked for the ship to start heaving anchors and advised that they would go as quick as possible. This is not proper piloting practice for the Mississippi River.[39]

As discussed above, even accepting as true that Captain Johnson was in a rush, Captain Wilson does not explain how being "rushed" or asking the crew to work quickly caused the accident at issue in this case. Moreover, the allegation that others perceived Captain Johnson as being rushed is not clear and convincing evidence that he was in fact in a hurry (which Captain Johnson denies) or that acting rushed is egregious enough to constitute gross negligence.

### IV. CONCLUSION

It is well-established that a Louisiana state commissioned river pilot such as Captain Johnson can only be held personally liable if there is clear and convincing evidence that the damages claimed were caused by the pilot's gross negligence or willful misconduct. None of the allegations made by Marquette against Captain Johnson describe behavior rising to the level of

---

[38] *See* deposition transcript of Captain Johnson at pg.40:12- 61:23 attached hereto as Exhibit B.
[39] *See* expert report of Captain Wayne Wilson at pg. 4 attached hereto as Exhibit F.

gross negligence. Accordingly, Marquette's Third-Party Complaint against Captain Johnson fails to meet the standard required under LA R.S. 34:1137.

For all the reasons stated above, Third-Party Defendant, Captain Robert "Bobby" Johnson respectfully requests this Honorable Court grant this Motion for Partial Summary Judgment finding Captain Johnson's actions do not rise to the level of gross negligence and dismissing Marquette Transportation Company Gulf-Inland, LLC's Third-Party Complaint against Capt. Johnson.

Respectfully submitted,

/s/ Alan R. Davis
ALAN R. DAVIS, T.A. (#31694)
ADELAIDA J. FERC6HMIN (#29859)
Lugenbuhl, Wheaton, Peck, Rankin
& Hubbard
601 Poydras St., Suite 2775
New Orleans, LA 70130
Telephone: 504-568-1990
Facsimile: 504-310-9195
Email: adavis@lawla.com
    aferchmin@lawla.com
**Attorneys for Defendant, Capt. Robert Johnson**